Filed 8/6/21  P. v. Hernandez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO JESUS HERNANDEZ,<br><br>        Defendant and Appellant. | A161095<br><br>(Alameda County Super. Ct. No. 16CR002946) |

A jury convicted Francisco Jesus Hernandez of two counts of first degree murder (Pen. Code[1], §§ 187, subd. (a), 189) (counts 1 & 2), one count of attempted murder (§§ 187, subd. (a), 664) (count 3), one count of attempted arson causing great bodily injury (§§ 451, subd. (a), 664) (count 4), and several special allegations and circumstances.  The trial court sentenced Hernandez to a total sentence consisting of a determinate term of 19 years and 4 months and an indeterminate term of life without the possibility of parole plus 50 years to life.  Hernandez appeals, arguing (1) there is insufficient evidence of premeditation and deliberation to support the jury's finding that he committed first

_____

[1] Undesignated statutory references are to the Penal Code.

1

degree murder; (2) there is insufficient evidence to support the jury's finding that he used gasoline and flame during the commission of the attempted murder; (3) the trial court erred by not instructing the jury sua sponte on self-defense; (4) the trial court miscalculated the prison term for the attempted arson count; and (5) the sentence for the attempted arson count should be stayed under section 654 because it is based on the same acts or course of conduct as the attempted murder count.  We find the evidence sufficient to support Hernandez's conviction for first degree murder but insufficient to show Hernandez personally used gasoline and flame in the course of the attempted murder.  We reject Hernandez's argument that the trial court had a sua sponte duty to instruct the jury on self-defense.  Like the Attorney General, we agree that Hernandez's sentence for the attempted arson count should be modified, although we conclude the correct sentence is different than what Hernandez and the Attorney General propose.  Finally, we agree with Hernandez and the Attorney General that Hernandez's modified sentence for attempted arson must be stayed under section 654.  We will therefore modify the judgment and affirm the judgment as modified.

## BACKGROUND

Miguel C. testified at trial that one night in August 2016, Juan R. drove Miguel C. and Alfonso I. in Miguel C.'s pickup truck to the area where Hernandez lived.[2]  Miguel C. had tried to

---

[2] Miguel C. knew Alfonso I. and Juan R. only by their nicknames, "Poncho" and "Shadow."  Miguel C. also knew

2

drive earlier that night, but Juan R. had threatened to use a gun, so Miguel C. had allowed Juan R. to drive. The pickup truck had a single bench seat. Alfonso I. sat in the middle, and Miguel C. sat in the passenger seat. Miguel C. did not know in advance why they went to Hernandez's neighborhood. However, Miguel C. had heard that there were problems between Juan R. and Hernandez.

When the three arrived in Hernandez's neighborhood, Juan R. did "doughnuts" with the truck, meaning driving around in circles, burning rubber on the tires, and leaving marks on the pavement, for about two minutes. Juan R. stopped and parked the truck at the corner of an intersection, on the same side of the street as Hernandez's home. Hernandez and his son came out of their house. As they came out, Hernandez and his son crouched down and covered their faces. They crossed the street to a car parked opposite Hernandez's house and took two guns from the behind the tire on the driver's side.

Hernandez and his son approached the truck. Juan R. asked Hernandez to give him a chance because he did not have a gun. As he said this, Alfonso I. was surreptitiously passing a silver revolver to Juan R. at a low level, from Alfonso I.'s lap to Juan R.'s lap as the men were sitting in the truck. While Alfonso

Hernandez by the nickname "Pancho." At trial, however, there was no dispute about the various men's identities. We refer to the victims and witnesses by their first names and last initial out of respect for their privacy. (Cal. Rules of Court, rule 8.90(b)(4), (b)(10); Advisory Com. com., Cal. Rules of Court, rule 8.90 [courts should consider referring to witnesses by first name and last initial].)

3

I. was passing Juan R. the gun, Hernandez and his son began shooting. Neither Juan R. nor Alfonso I. raised their gun or fired any shots.

When the shooting started, Miguel C. got off the passenger seat and crouched low on the floorboards. After he finished shooting, Hernandez came to the passenger door of the truck and pulled Miguel C. out of the truck onto the sidewalk. Hernandez hit Miguel C. on his upper jaw and crushed his palate. Miguel C. fell to the ground, and Hernandez and his son both beat him. Miguel C. protested that he did not have anything to do with the problems between Juan R. and Hernandez. Hernandez replied that Miguel C. had come with them, so he was going to go with them.

Hernandez then told his son, "You know what you have to do." Miguel C. stood up on the sidewalk next to the passenger side of the truck, facing Hernandez with Hernandez's son behind him. Hernandez's son then began shooting towards Miguel C.'s back, with the bullets going past his sides. Hernandez's son went back into the house and reloaded, then came back outside and resumed firing. At that time, Miguel C. was shot in his back, left arm, right hand, and his left cheek. Hernandez then shot Miguel C. from the front, in Miguel C.'s right shoulder. Miguel C. could not run because there was a crowd of people on the other side of the truck.

After Hernandez and his son shot Miguel C., Hernandez told a third man, "Bring me gas." The third man poured gasoline on Miguel C. from a gasoline can. Hernandez then pushed

4

Miguel C. back into the pickup truck. Miguel C. saw Hernandez put a lit piece of paper into the truck, and the truck caught fire quickly. Miguel C.'s hands and sweatshirt were on fire. He opened the door, got out of the truck, and took off his sweatshirt. Hernandez said, "Look, he's burning," and laughed. Miguel C. could not yell because of the injuries to his mouth, so he ran away. After taking off his sweatshirt, Miguel C. hid in a nearby vacant lot until he saw police cars arriving. He then stumbled to an ambulance.

Several witnesses who lived in nearby homes largely corroborated Miguel C.'s account of these events. Laura V. lived next door to Hernandez, on the side farther away from where Juan R. parked the truck. Laura V. recalled that the windows in a vehicle belonging to Hernandez had been broken the day before the shooting. The night of the shooting, Laura V. heard a fight break out. She looked out the window of her bedroom facing the street and saw Hernandez walking. She then turned into the room to get her glasses. While she was retrieving her glasses, she heard the sounds of about five gunshots. When she returned to the window, she saw Hernandez's back as he was standing on the sidewalk shooting a few more shots at the truck or someone in the truck. After the shooting, she turned inside to look at her children who were in the room. She turned back to the window and saw a gas can on the hood of the truck and someone running out of the truck in flames. She then saw Hernandez come running up the street in her direction to get into a car in the

middle of the street in front of her house.  She heard Hernandez laughing a heavy laugh as the man on fire ran away.

Two other witnesses, Erick E. and Maria S., lived in the house across the street from where Juan R. parked the truck. The sound of a vehicle doing doughnuts woke Erick E. at around 1:30 a.m.  He smelled the burned tires from his bedroom.  He did not move because it was common for people to be doing doughnuts in the street.  He then heard two gunshots, the screeching of a car peeling out, and what sounded like a vehicle hitting a post.  Erick E. moved to the living room, where he saw through a window the truck parked on the street opposite his house.  Erick E. had a view straight at the driver's side of the truck.  Erick E. saw Hernandez in the street walking towards the truck and shooting eight or nine shots into the truck.  While Hernandez was shooting, he was yelling at the truck, "Why did you do it?"  Hernandez's son was with him.  Hernandez and his son pulled a passenger out of the passenger side door, hit him, and put him back in the truck.  He then heard another, smaller caliber shot.  Erick E. saw someone put gasoline on the truck, but he did not see who it was.  Erick E. went back to his bedroom to pick up his children, and then saw someone on fire running.

A few days before the shooting, Maria S. heard cars in the neighborhood doing doughnuts.  On the night of the shooting, she awoke to hear five people yelling, "Why did you do that?"  She recognized Hernandez's voice.  She also heard a screech and what sounded like the truck hitting a pole on the side of the road. After taking her children to a back bedroom, Maria S. went to the

6

living room.  Through a window, she saw Hernandez standing in the street a couple feet from the truck, shooting at the driver.  Hernandez's son then pulled the passenger out of the passenger side of the truck, shot him, and beat him.  Maria S. recalled that Hernandez remained on the driver's side of the truck.  Hernandez's son and a third man put the passenger back in the truck and put gasoline on the truck and on a shirt, then lit the shirt on fire and threw it on the truck.  Hernandez, his son, and the third man ran up the street away from the truck and Maria S.  They were unable to start a limousine that belonged to Hernandez, which was parked near Maria S.'s house.

The police later discovered 10 .40 caliber bullet casings in a rainbow shape on the driver's side of the truck, which indicated that the shooter was moving while he was firing.  The police also discovered two .45 caliber casings on the passenger side of the truck and one additional bullet casing in the passenger side of the truck bed.  They found no bullet casings in the truck.  There were doughnut marks on the street near where the truck parked, as well as on an extension cord running from Hernandez's house to the limousine parked across the street from his house.  A search of Hernandez's house later revealed boxes of .45 caliber ammunition.  A bullet removed from Miguel C.'s mouth was determined to be .45 caliber.  A search of the pickup revealed a silver .25 caliber semi-automatic pistol on the floor in front of the driver's seat with one cartridge in the chamber and three in the magazine that could hold six cartridges.

After a seven-day trial, the jury deliberated for about two hours before finding Hernandez guilty of two counts of first degree murder of Juan R. and Alfonso I. (§§ 187, subd. (a), 189), one count of attempted murder of Miguel C. (§§ 187, subd. (a), 664), and one count of attempted arson causing great bodily injury by burning the truck containing Miguel C. (§§ 451, subd. (a), 664). The jury found true a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) As to the counts of first degree murder, the jury found true the special allegations that Hernandez was personally armed with a firearm, personally used a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death during the commission of the offenses. As to the count of attempted murder, the jury found true the special allegations that Hernandez personally used a firearm and personally used a deadly and dangerous weapon, i.e., gasoline and flame, during the commission of the offense. The trial court sentenced Hernandez to life without possibility of parole on the first degree murder counts with consecutive enhancements of 25 years to life for each count. The court sentenced Hernandez to seven years with 10-year and one-year enhancements for the attempted murder, with the one-year enhancement stayed, and to two years and four months for the attempted arson count, with both sentences to run consecutive to the sentence on count 1. In total, this amounted to a determinate sentence of 19 years and four months and an indeterminate sentence of life without possibility of parole plus 50 years to life.

8

## DISCUSSION

### I. Sufficiency of evidence

Hernandez argues the evidence was insufficient to show either that the homicides of either Juan R. or Alfonso I. were deliberate and premeditated or that he personally used gasoline and flame in the attempted murder of Miguel C. "Upon a challenge to the sufficiency of evidence for a jury finding, we ' " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 323–324.)

### A. First degree murder

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) If a killing is " 'willful, deliberate, and premeditated,' " it is first degree murder. (§ 189.) " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be

arrived at quickly." ' " ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

"In *People v. Anderson* (1968) 70 Cal.2d 15 [(*Anderson*)], [the California Supreme Court] observed that '[t]he type of evidence which [it] has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories': (1) facts about planning activity 'prior to the actual killing which show[s] that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) 'facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) 'facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design." ' [Citation.] 'Since *Anderson*, [the California Supreme Court has] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' " (*People v. Rivera, supra,* 7 Cal.5th at p. 324.)

Hernandez contends the evidence that he retrieved a gun before confronting the men in the truck, that he shot multiple rounds at Juan R. and Alfonso I., and that he lit the truck on fire after telling Miguel C. that he came with the men in the truck so

10

would leave with them, is insufficient to show premeditation and deliberation. We disagree and conclude that this evidence, when considered in conjunction with other facts adduced at trial, sufficiently supports the jury's verdict.

Using the first factor from *Anderson, supra,* 70 Cal.2d at pages 26–27, Hernandez's decision to stash a weapon in the car across the street from his house in advance, walk to the car and arm himself after the truck parked, and then approach the truck might be construed, as Hernandez urges, as Hernandez taking the prudent step of arming himself before approaching the truck that had done doughnuts in the street to get his attention. But the jury could also construe these facts as indicating Hernandez had prepared for violence, and other circumstances of the shooting support that interpretation. Juan R.'s initial comment when Hernandez approached, asking Hernandez to give him a chance because he was unarmed, suggests that Hernandez was already threatening violence against Juan R. before perceiving any specific threat from the occupants of the truck. Hernandez notes that Alfonso I. was surreptitiously passing a gun to Juan R. when Hernandez approach the truck and opened fire. But the surreptitious nature of that action makes it unlikely that Hernandez ever saw the gun in the truck. Alfonso I. kept the gun low, at the height of the men's laps, precisely to keep it out of Hernandez's view a few steps away. Additionally, Erick E. testified that Hernandez was walking towards the truck when he was shooting. This indicates that Hernandez was calmly carrying out an attack on Juan R., Alfonso I., and Miguel C.

11

rather than reacting to seeing anything inside the truck. This is inconsistent with Hernandez's theory that he acted defensively. If Hernandez had opened fire only after getting near enough to the truck to argue or see a gun in the truck, he likely would have run quickly and fired while backing away from the truck, not walked closer to the truck.

Hernandez briefly posits that someone in the truck must have fired the gun earlier, or that there was more than one gun, based on Erick E.'s testimony that he heard two shots before Hernandez began firing, Miguel C.'s statement that he saw Alfonso I. pass a revolver to Juan R. (as opposed to the semi-automatic pistol found in the truck), and that the pistol had the capacity to hold seven rounds but contained only four when the police recovered it. Hernandez's reading of the evidence may be plausible, but the jury reasonably concluded otherwise, based on the absence of any bullet casings in the truck, Miguel C.'s testimony that he had never seen the gun before Alfonso I. passed it to Juan R., Miguel C.'s further testimony that no one ever fired the gun or held it in the air, and the fact that Erick E. was the only witness who mentioned hearing any shots before Hernandez opened fire on the truck.

Looking to the second factor from *Anderson, supra,* 70 Cal.2d at page 27, Hernandez next argues that there was no evidence of a motive beyond self-preservation. But Miguel C. was aware before the shooting that Juan R. had some sort of disagreement with Hernandez. Someone had broken the windows in one of Hernandez's vehicles the day before the

12

shooting. As Hernandez admits, by spinning doughnuts in the street Juan R. appeared to be trying to get Hernandez's attention. Two witnesses also testified that they heard Hernandez yelling, "Why did you do it?" during the incident. This evidence could indicate that Hernandez shot Juan R. in retaliation for the damage to Hernandez's vehicle, the perceived slight of Juan R. spinning doughnuts near Hernandez's house, or both. The jury could make these inferences despite the unreasonableness or incomprehensibility of such a motive to a reasonable person. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.) Hernandez characterizes his question, "Why did you do that?" as an attempt to engage Juan R. and Alfonso I. in conversation, but considering that Hernandez was yelling at the men, those same words could be viewed as cries of rage betraying his reasons for the killing rather than genuine queries to his victims. Even if we agreed with Hernandez that this evidence undermines a finding of motive, reconciliation of conflicts in the evidence is squarely within the province of the jury. (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also

reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' "].)

As to the third factor from *Anderson*, *supra*, 70 Cal.2d at page 27, Hernandez maintains the manner of killing Juan R. and Alfonso I. by emptying a gun into the cab of the truck does not show premeditation or deliberation. He notes that the rainbow pattern of the shell casings indicates he was moving while shooting, not standing still in an execution-style killing. Hernandez also contrasts how the shots were fired in rapid succession with a shooting in which the killer pauses between shots and has a moment to reflect. As with Hernandez's other evidentiary arguments, his inferences are logical but are not the only inferences supported by the evidence, particularly when considered in light of additional facts. Hernandez's movement is unlike a stationary execution-style killing, but the fact that Erick E. observed him moving towards the truck rather than away from it, and walking instead of running or moving quickly, indicates that Hernandez was calm, collected, and focused on killing his victims. Hernandez also ignores his behavior after shooting Juan R. and Alfonso I., in which he methodically shot and beat Miguel C. and participated in the burning of the truck with Miguel C. in it. Hernandez told Miguel C. that he would leave with Juan R. and Alfonso I. because he came with them, displaying a cold, implacable desire to kill. Hernandez also gave deliberate instructions to his son to participate in the killing, telling him, "You know what you have to do." Finally, Miguel C. and Laura V. both heard Hernandez laugh after lighting Miguel C. on fire.

14

A jury could easily conclude from Hernandez's behavior that Hernandez was acting in a cool and collected fashion, which would support a finding of deliberation and premeditation.

This case presents the inverse scenario from *People v. Boatman* (2013) 221 Cal.App.4th 1253. That decision held the evidence of Boatman's premeditation and deliberation was insufficient, in part based on his behavior after the shooting. (*Id.* at p. 1267.) There, after the shooting, Boatman was horrified and distraught, told his brother to call the police, could be heard crying in the background during the 911 call, tried to resuscitate the victim, and asked the police to call an ambulance when they arrived. (*Ibid.*) The court concluded this and other evidence, even when viewed in the light most favorable to the prosecution, strongly suggested a lack of a plan to kill the victim and showed the manner of killing was not so exacting that Boatman must have killed according to a preconceived design. (*Ibid.*) Hernandez's behavior after killing Juan R. and Alfonso I. could not be more different. His apparently remorseless campaign to inflict more suffering and death on Miguel C. after killing Juan R. and Alfonso I. strongly suggests Hernandez was acting with deliberation and purpose.

In short, while some aspects of the record might support Hernandez's view of the evidence, when considered as a whole, the evidence is sufficient to support the jury's finding beyond a reasonable doubt that Hernandez was guilty of first degree murder. (*People v. Brady* (2010) 50 Cal.4th 547, 565 ["The mere

15

*possibility* of a contrary finding as to defendant's mental state does not warrant a reversal of the guilt judgment"].)

**B. Sufficiency of evidence that Hernandez used gasoline and flame**

Hernandez's second attack on the sufficiency of the evidence is directed at the jury's finding that during the commission of the attempted murder of Miguel C., he personally used a deadly weapon in the form of gasoline and flame. Section 12022, subdivision (b)(1) states, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." Hernandez's argument rests on his assertion that none of the four witnesses to the crime testified that he personally doused Miguel C. with gasoline. Laura V. told the jury she did not see how the fire started. Maria S. testified that a third person poured gasoline on the truck and lit it. Erick E. testified that "they" put gasoline on the truck to start the fire. But when asked whether he recognized the person who put gasoline on the truck, Erick E. admitted he did not see who put the gasoline on the truck. Miguel C. testified that Hernandez told a third person to fetch gas, and then the third person put the gasoline on Miguel C. Miguel C. said that Hernandez then put Miguel C. back into the truck and put a lit piece of paper into the truck, causing the truck and Miguel C. to catch fire. Hernandez also notes that the prosecutor, in her closing argument, conceded

that this evidence was insufficient to prove Hernandez personally used the gasoline and flame and told the jury to find that allegation was not true.

We agree with Hernandez that this testimony is insufficient to prove he personally used the gasoline. The only witness who directly connected Hernandez to the burning was Miguel C. He testified that someone else poured the gasoline but Hernandez lit it. The jury was instructed that a person personally uses a deadly and dangerous weapon if he or she intentionally "[p]ours gasoline into and around a truck and then lights a fire and throws the flame onto the gasolined truck causing the truck to be inflamed while another person is occupying the truck." Perhaps because of this instruction, the Attorney General does not argue that the jury could have found the allegation true based on Hernandez's use of the flame but not the gasoline. In light of the jury instruction and the Attorney General's position, we accept for purposes of this case that Hernandez had to personally use both gasoline and fire to satisfy the allegation. Given the lack of testimony connecting Hernandez to the gasoline, the evidence supporting the allegation is insufficient.

The Attorney General claims the verdict finds sufficient support in additional testimony by Erick E. on cross-examination that he saw no third person in the area and that he believed Hernandez and his son were the ones who doused the truck. The testimony in question is not as clear as the Attorney General contends, but it is unnecessary to parse it closely. At best, Erick

E.'s remarks could be construed to indicate that only Hernandez *or* his son were in the area and could have poured the gasoline and lit it.  Erick E. never specifically identified Hernandez, rather than his son, as the person who used the gasoline and flame.  Especially when considered in conjunction with Erick E.'s admission on direct examination that he did not see who started the fire, the testimony cited by the Attorney General cannot support the jury's finding that Hernandez personally used the gasoline and flame.  We will therefore strike the one-year enhancement, which had been stayed, from the sentence.

## II.    Instruction on self-defense

Hernandez next contends his murder convictions should be reversed because the trial court failed to instruct the jury on self-defense.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' "  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  "In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises ' "only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' "  (*People v. Dominguez*

18

(2006) 39 Cal.4th 1141, 1148.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) "We review a claim of instructional error de novo." (*People v. Barber* (2020) 55 Cal.App.5th 787, 798.)

Hernandez contends the trial court should have delivered CALCRIM No. 505. That instruction states that a defendant kills in lawful self-defense if (1) the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury, (2) the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger, and (3) the defendant used no more force than was reasonably necessary to defend against that danger. (See *People v. Stitely* (2005) 35 Cal.4th 514, 551 ["a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend"].) Hernandez contends substantial evidence supported this instruction based on the testimony that Juan R. did doughnuts in the street, someone "perhaps" fired gunshots before or during the doughnuts, Hernandez argued with the men in the truck, and Alfonso I. was passing a gun to Juan R. in the truck.

Hernandez's trial counsel explained to the trial court his decision not to request an instruction on self-defense or argue that theory. After the jury began deliberations, Hernandez's trial counsel told the trial court, "When I spoke in my opening

19

statement, I mentioned the possibility of self-defense, and when we were going over jury instructions, I did not request self-defense.  Having gone through the case and not having put on any evidence of self-defense, I made the decision not to argue that.  As the Court knows, my argument was that they can't identify my client.  The prosecutor didn't prove her case.  I wanted to make a record that that was a choice by me not to request self-defense."  This statement makes clear that Hernandez's counsel acquiesced in the trial court's failure to instruct on self-defense because of his tactical choice to defend the case on the issue of identity.

A trial court has a sua sponte duty to instruct on a defense only where the defense is not inconsistent with the defendant's theory of the case.  (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1148.)  Hernandez's theory of the case in the trial court was that the witnesses had not sufficiently identified him as the shooter.  Presenting an instruction on self-defense, which the jury could only find if it concluded Hernandez had been the shooter, would have been directly contrary to Hernandez's theory of the case, as demonstrated by his trial counsel's deliberate acquiescence in the lack of the self-defense instruction.  This obviated the need for the trial court to instruct on self-defense, regardless of whether substantial evidence would have supported such an instruction.  (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1165 [trial court need not instruct on inconsistent defenses " 'because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon' "

and because such instructions " 'would hamper defense attorneys,' " italics omitted].)

Moreover, any error in failing to instruct on self-defense was harmless even under the stricter federal standard that Hernandez asks us to apply. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 199 [California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [federal test for harmless error is whether the error was harmless beyond a reasonable doubt].) The jury was instructed on both first degree and second degree murder. The jury's choice to convict Hernandez of first degree murder demonstrates it believed he had the more culpable mental state of acting willfully, deliberately, and with premeditation. (§ 189.) This finding is inconsistent with Hernandez's theory on appeal that he shot in self-defense only after developing a reasonable fear of imminent harm from hearing shots, seeing Juan R. spinning doughnuts in the truck, and seeing Alfonso I. pass Juan R. a gun. The lack of an instruction was therefore harmless. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1156 [first degree murder verdict indicated jury rejected claim that intoxication interfered with ability to form the requisite mental states, so lack of involuntary intoxication instruction was harmless]; *People v. Prettyman* (1996) 14 Cal.4th 248, 276 [conviction on first degree murder instead of second

21

degree murder showed the omission of instruction on involuntary manslaughter was harmless].)

Hernandez's evidence of self-defense was also weak, so we are confident any jury would have rejected his self-defense claim. As discussed above, the evidence that anyone in the truck fired a gun before Hernandez shot Juan R. and Alfonso I. is thin. Erick E. alone testified to hearing shots before Hernandez began shooting, and his testimony was contradicted by the absence of any shell casings in the pickup and Miguel C.'s testimony that neither Juan R. nor Alfonso I. fired the gun. Hernandez's theory that the gun in the pickup was visible to him is pure speculation, given Miguel C.'s testimony that Alfonso I. passed the gun surreptitiously, at the level of the men's laps. When contrasted with the strong evidence of Hernandez's willful and deliberate actions in firing on the truck while walking towards it, displaying an implacable intent to kill Miguel C. after shooting Juan R. and Alfonso I., and laughing after the crimes, a self-defense instruction would not have changed the outcome under any standard of review.

## III. Sentence for attempted arson causing great bodily injury or death

Hernandez contends, and the Attorney General agrees, that his sentence for attempted arson causing great bodily injury or death under section 451, subdivision (a) must be reduced and stayed. We are not bound by the Attorney General's confession of error. (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1021.) After independently reviewing the issues, we agree with the

parties that Hernandez's sentence must be modified, but not in precisely the fashion the parties have proposed. We also agree that the modified sentence should be stayed.

## A. *Proper sentence*

The trial court sentenced Hernandez to a consecutive sentence of two years and four months in prison for the attempted violation of section 451, subdivision (a). It appears to have calculated this sentence by taking one-third of the middle term specified in that statute, which is seven years.

Hernandez rightfully points out that this sentence fails to account for the fact that he was convicted of attempted arson causing great bodily injury, not the completed offense. "We may correct an unauthorized sentence." (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1165.) Hernandez asks us to correct the error by applying section 664, which states what when no other statute specifies the punishment for an attempted crime and the crime attempted is punishable by imprisonment in the state prison, the attempted crime shall be punished by imprisonment "for one-half the term of imprisonment prescribed upon a conviction of the offense attempted." (§ 664, subd. (a).) Combining section 664 with section 451, subdivision (a) would yield a sentence of three years and six months. Hernandez and the Attorney General agree that this is the appropriate sentence. Hernandez initially argued that, like the trial court, we should reduce this by one-third pursuant to section 1170.1, subdivision (a), which governs the length of consecutive sentences on multiple felony counts. But he ultimately agreed with the Attorney

23

General that section 1170.1, subdivision (a) is inapplicable because the sentence will be stayed pursuant to section 654, as discussed, *post*.  (*Cantrell*, at p. 1164.)

As Hernandez and the Attorney General acknowledge, section 455 establishes a different sentence.  Section 455, subdivision (a) defines a crime of attempted arson, stating, "Any person who willfully and maliciously attempts to set fire to or attempts to burn or to aid, counsel or procure the burning of any structure, forest land or property, or who commits any act preliminary thereto, or in furtherance thereof, is punishable by imprisonment in the state prison for 16 months, two or three years."  If we were to apply this statute, with neither party asking us to remand for resentencing, we would select the middle term like the trial court and set Hernandez's sentence at two years.

Hernandez and the Attorney General believe section 455 does not apply here because Hernandez was charged with arson causing bodily injury under section 451, subdivision (a), which is beyond the scope of attempted arson in section 455.[3]  We disagree and conclude that section 455 establishes the proper sentence.  This case is comparable to *People v. Alberts* (1995) 32 Cal.App.4th 1424 (*Alberts*).  There, Alberts was charged with attempted arson

_____

[3] Section 451 states, "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property. [¶] (a) Arson that causes great bodily injury is a felony punishable by imprisonment in the state prison for five, seven, or nine years."

of an inhabited structure under section 451, subdivision (b) and section 664.  (*Alberts,* at p. 1426.)  She moved to dismiss, arguing that section 455, not section 451, established the crime of attempted arson.  (*Alberts,* at p. 1426.)  The trial court denied the motion, ruling that section 451, subdivision (b) provided a more particularized punishment for certain kinds of arson, such as arson of an inhabited structure.  (*Alberts,* at p. 1426.)  After a bench trial, the court convicted Alberts and sentenced her according to sections 664 and 451, subdivision (b).  (*Alberts,* at pp. 1425–1426.)

The Court of Appeal agreed with the defendant that section 455 applied rather than the combination of the general attempt statute in section 664 and subdivision (b) of section 451.  (*Alberts*, *supra*, 32 Cal.App.4th at p. 1427.)  The court first recited the rule of lenity.  (*Ibid.*)  It then noted that section 664 by its terms applies only in the absence of another applicable statute.  (*Alberts,* at pp. 1427–1428.)  It found that section 455 was another applicable statute, and that ignoring it would improperly require the court to judicially re-write section 455 so it specified the punishment for attempted arson of any structure except an inhabited dwelling.  (*Alberts,* at pp. 1427–1428.)  *Alberts* further observed that section 455 applies to all structures, while section 451, subdivision (b) applies only to the subset of inhabited structures.  (*Alberts,* at p. 1428.)  After finding this meant the two statutes irreconcilably conflicted, *Alberts* then applied section 455 as a more specific statute than the combination of sections 451, subdivision (b) and 664.  (*Alberts,* at p. 1428.)

25

The position of Hernandez and the Attorney General here—that section 451, subdivision (a) governs Hernandez's actions because they caused great bodily injury—is essentially identical to the prosecutor's argument in *Alberts* that section 451, subdivision (b) governed Alberts' arson because it involved an inhabited structure. We reject it for similar reasons as *Alberts*. On its face, section 664 establishes the punishment for an attempt to commit a crime only "where no provision is made by law for the punishment of those attempts." Because section 455 addresses attempted arson, this condition is not met. Likewise, section 455 can be viewed as more specific to the crime of attempted arson, and it therefore prevails over the general attempt statute in section 664.

The parties argue that section 455 concerns arson affecting property, while section 451, subdivision (a) applies to arsons causing great bodily injury. This is incorrect, as section 451, subdivision (a) criminalizes only the burning of "any structure, forest land, or property" that causes great bodily injury. In other words, section 451, subdivision (a) requires the burning of property, just like section 455. (§ 455, subd. (a) [setting the punishment for "[a]ny person who willfully and maliciously attempts to set fire to or attempts to burn or to aid, counsel or procure the burning of *any structure, forest land or property*, or who commits any act preliminary thereto, or in furtherance thereof," italics added].) Regardless, even if section 451, subdivision (a) could be viewed as more specific because of its concern with great bodily injury, that would still only place

26

section 455 on equal footing with sections 664/451, subdivision (a), with the former more specific as to the attempt aspect of the crime and the latter more specific as to its effects. The rule of lenity dictates that when two statutory interpretations are thus in equipoise, the " '[i]t is the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit.' " (*Alberts*, *supra*, 32 Cal.App.4th at p. 1427.) Although Hernandez asks us to apply sections 664/451, subdivision (a), the rule of lenity here favors applying section 455, as his sentence under that statute would be two years, rather than three years and six months under sections 664/451, subdivision (a). We will therefore apply section 455.

As in *Alberts*, the proper remedy in this case is to modify the judgment to reflect that Hernandez was convicted of one count of violating section 455 and reduce the sentence to two years in state prison.[4]

---

[4] We perceive no detriment to modifying Hernandez's conviction in this fashion after trial. If anything, attempted arson under section 455 "greatly enlarges the concept of attempt" as compared with section 664 and section 451. (2 Witkin and Epstein, Cal. Crim. Law (4th ed. 2021) Crimes Against Property, § 272.) Section 455 also lacks the element of great bodily injury. (Cf. CALCRIM 1501 [arson causing great bodily injury under § 451, subd. (a)] with CALCRIM 1520 [attempted arson under § 455].) Hernandez's prosecution under sections 664/451, subd. (a) was therefore likely more favorable to him than a trial on the correct charge would have been, as the prosecution's charging choice required it to prove the additional element of great bodily injury.

## B. *Section 654*

Hernandez's argument for staying the attempted arson sentence rests on section 654. Subdivision (a) of that statute states, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." *Neal v. State* (1960) 55 Cal.2d 11, disapproved of on other grounds by *People v. Correa* (2012) 54 Cal.4th 331, 334, established the governing test for determining whether section 654 bars multiple punishments in a particular case. "Even though section 654 refers to an 'act or omission,' the *Neal* court opined that '[f]ew if any crimes . . . are the result of a single physical act.' [Citation.] Accordingly, the relevant question is typically whether a defendant's ' "course of conduct . . . comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." ' " (*Correa*, at p. 335.)

"Whether a course of conduct is indivisible depends upon the intent and objective of the actor." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) " 'Whether the facts and circumstances reveal a single intent and objective within the meaning of Penal Code section 654 is generally a factual matter; the dimension and meaning of section 654 is a legal question.' [Citation.] We apply the substantial evidence standard of review to the trial court's implied finding that a defendant harbored a separate intent and objective for each offense.' " (*People v. Dowdell* (2014)

227 Cal.App.4th 1388, 1414.) We may correct a failure to stay a sentence under section 654 despite Hernandez's failure to object on that basis below. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.)

The trial court made no express finding that Hernandez's intent and objective for the attempted murder and attempted arson were different, and there is no evidence in the record to support an implied finding to that effect. The shooting and burning of Miguel C. closely followed the shooting of Juan R. and Miguel C., indicating the treatment of Miguel C. was part of the same course of conduct. The temporal proximity, combined with Hernandez's comment about Miguel C. leaving with Juan R. and Alfonso I. because he came with them, indicates that the shooting and burning had the same murderous intent that motivated Hernandez to shoot into the pickup. Accordingly, we agree with Hernandez and the Attorney General that the attempted murder and attempted arson were part of the same indivisible course of conduct and that section 654 requires us to stay Hernandez's sentence for attempted arson.[5]

---

[5] Hernandez argues that the attempted arson was not just part of the same course of conduct but was the same act as the attempted murder. Hernandez's argument ignores the fact that the jury may have convicted him of attempted murder based on his or his son's acts of shooting Miguel C. as well as the burning of Miguel C. in the truck. Where a verdict on a charge rests on two theories and section 654 would bar separate punishment under only one of the theories, it is unclear whether a court should stay the punishment on the charge or not. (*People v. Roberson* (1988) 198 Cal.App.3d 860, 872 [staying punishment because court would not rely on a guess that the bases for

## DISPOSITION

The judgment is modified to strike the one-year enhancement under section 12022, subdivision (b)(1) on the attempted murder conviction (count 3).  It is further modified to reflect that Hernandez was convicted in count four of one violation of section 455 and is sentenced to two years in state prison, stayed pursuant to section 654.  As so modified, the judgment is affirmed.

BROWN, J.

WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.


*People v. Hernandez* (A161095)

---

different counts were different]; *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338–1339 [disagreeing with *Roberson*].)  It is unnecessary for us to take up this issue here.  Section 654 bars Hernandez's punishment for attempted arson as part of a single course of conduct with the attempted murder, even if the jury's verdict on the attempted murder was based on a shooting theory rather than an arson theory.